1    recertification, and even if he was recertified by

2    MCOLES, and there is a process for having that

3    done, MCOLES has identified 21 essential job

4    functions to be performed by a police officer.

5         According to MCOLES, these functions are

6    to assist law enforcement agencies and health care

7    professionals in assessing a candidate's medical

8    fitness to safely and efficiently perform

9    significant job tasks with or without

10   accommodations.

11        MCOLES considered these functions to be

12   core duties of a police officer.

13        Mr. Young would not be able to perform

14   many of these core functions if the department was

15   required to allow him to return to work as a police

16   officer without the limitation -- or with the

17   limitation he not perform the work that involved

18   aggressive efforts.

19        Mr. Young has also requested that in

20   order to accommodate him so he would not have to

21   perform those functions, he be allowed to use --

22   before I get to that, he be allowed to use a stun

23   gun instead of a department issued firearm.  MCOLES

24   requires police officers to pass a proficiency test

25   with respect to firearms.  Use of a stun gun in

1    Michigan is a felony under statute.

2                    As I previously indicated as an

3    accommodation, Mr. Young has asked he be assigned

4    to a position of a follow-up investigator so he

5    would be -- would not be required to engage in

6    aggressive tactics required by a police officer.

7    There is no such current position in the

8    department.  The department has a policy of not

9    allowing employees, certainly on a long-term basis,

10   to be assigned to a light-duty position on a

11   permanent basis.

12                   While an employer has a duty under

13   federal and state law to accommodate an employee's

14   disability, it does not have a duty to create a new

15   position to accommodate an employee.  There is

16   authority for this both under the EEOC guidelines

17   and under a Supreme Court decision in Michigan.

18                   Further, in a previous litigation between

19   Mr. Young and the Township which started in the

20   mid-1990s and he was requesting to be assigned to

21   an investigator position, on appeal of dismissal or

22   summary disposition of a handicapped discrimination

23   claim, the Michigan Court of Appeals affirmed the

24   dismissal and found the permit by Mr. Young to hold

25   the position without his ability, without the

1   ability to function as a complete police officer

2   would undermine the effectiveness of the police

3   force.  And his appeal was denied.

4        It is the recommendation of the Chief

5   that Mr. Young be terminated because even if he

6   became recertified, he cannot perform the essential

7   functions of a police officer's position.  And the

8   department is not required to accommodate him by

9   creating a position.

10        We will present evidence on all these

11   issues, and I have already given a copy of what I

12   have as proposed 11 exhibits to Mr. Young's

13   attorney and a copy to the reporter.  And I will

14   give these to the trustees and counsel and

15   introduce them one at a time through Mr. Young,

16   subject to any objections by counsel.

17        MR. MUSKOVITZ:   There are 11 exhibits.

18        (Brief pause).

19        MR. ST. CHARLES:   Do you have an opening

20   statement?

21        MR. OSETEK:   I will make a brief opening

22   statement.

23        As I introduced myself before, my name is

24   Peter Osetek.  I am an attorney in Ann Arbor.  And

25   I do, among other issues, employment related

1    issues.

2              I represent Officer Young, who has been

3    an employee of this township for over 20 years.  He

4    was injured on the job in a training session,

5    missed three days work and was back on light duty

6    after that until the end of 1992.  The hearing

7    today is a rather unique type of hearing under a

8    specific Michigan statute, which I believe you all

9    have copies of.

10             Do you know if they were provided with

11   copies of the statute?

12             MR. MUSKOVITZ:   I don't know.

13             MR. SEDLAK:   I don't believe I passed

14   out the Veterans Preference Act to each township

15   trustee.

16             MR. OSETEK:   Be that as it may, we do

17   have the statute with us and obviously if there are

18   any questions about it, we can make sure you have

19   copies of it.

20             There are several requirements for a

21   veteran, such as Officer Young, before he can be

22   terminated from his employment and this -- the

23   notice he received initially scheduling this

24   hearing for July, for earlier in the summer and

25   then rescheduled for tonight contains the act and

1    the allegations.

2           And the allegation is that he should be

3    removed as an employee of the Green Oak Township

4    Police Department on the basis that he is unable to

5    perform the essential functions of a Green Oak

6    Township police officer with or without

7    accommodation.  And that is the issue before you

8    today.

9           There is a 20 year history; there is some

10   prior litigation, but none of that has any bearing

11   on whether under the Veterans Preference Act the

12   Chief can terminate or the Township can terminate

13   Officer Young's employment.  And it is our

14   contention that there is no basis under the

15   Veterans Preference Act for terminating Mr. -- or

16   Officer Young.

17          And let me point to a couple sections in

18   the Veterans Preference Act just to try and keep as

19   brief and as simple as possible.  It appears in the

20   Michigan statutes at Title 35, Section 401 through

21   403, I believe, 402 A and 403.

22          401 states, and I am not going to quote

23   the whole thing otherwise we will be here way too

24   late, that there is a preference for veterans

25   appointment and employment:  Age, loss of limb or

1   other physical impairment which does not in fact
2   incapacitate shall not be deemed to disqualify
3   them.  You have to keep that in mind when you are
4   looking at or listening to what Officer Young can
5   and cannot do.  And he is clearly not
6   incapacitated.  He might not be able to do
7   everything that Green Oak Township or some State
8   Board might think a police officer should be able
9   to do, but I submit there are officers on the force
10  today who cannot do those 21 essential functions.
11          So we have to remember under the Veterans
12  Act:  Age, loss of limb or other physical
13  impairment which does not in fact incapacitate,
14  does not disqualify him.  And that is what you are
15  going to be looking at.
16          The second section of the Veterans
17  Preference Act 35, 402 essentially says that in
18  order to terminate a Veteran, there has to be just
19  cause.  And I don't know whether any of you are
20  familiar with the term "at will employment", but in
21  general in Michigan, and states have different
22  employment laws, but in Michigan if we are an
23  employee, we are all considered at-will employees.
24          The Veterans Preference Act changes that
25  status for Veterans that qualify, such as Officer

1    Young, to -- from an at-will status to a just-cause
2    status. And Officer Young, because he is a
3    veteran, can only be terminated for just cause. So
4    then the question is, what is just cause. And the
5    statute tells us that.

6           The statute says, and it lists six
7    different items, talks about no veteran shall be
8    removed or suspended except for official
9    misconduct, habitual serious or willful neglect in
10   the performance of duty, extortion, conviction of
11   an intoxication, conviction of felony or
12   incompetency. Those are the six issues you will
13   need to decide if you are going to determine that
14   Officer Young can be terminated.

15          One of those has to apply to him. And I
16   would submit none of them do. And the statute and
17   the cases interpreting the statute are clear.
18   There has to be just cause. It is not just that he
19   can't do everything that somebody says he has to be
20   able to do.

21          Has he conducted himself in a way that
22   gives the Township just cause to terminate him.
23   And under the Veterans Preference Act, I suggest
24   that has not happened.

25          As Mr. Muskovitz indicated there has been

1  prior litigation. And we can spend a lot of time

2  talking about the cases and what they mean and what

3  they don't mean and who was involved and who was

4  not involved. But the issue today is a simple one,

5  a clean one.

6      And when we are talking about scheduling,

7  initially I didn't know whether this would take a

8  day or two days, or whatever. We fully believe we

9  will be out of here in short order once the

10  testimony is heard and once I believe it is clear

11  none of the criteria for the Veterans Act

12  termination are met.

13      There were a few items that were raised

14  that I believe I should clarify. I believe

15  Mr. Muskovitz mentioned the Workers Comp. Bureau

16  held a hearing in October of 1991. It was 2001,

17  last October.

18      MR. MUSKOVITZ: Stand corrected.

19      MR. OSETEK: It is not a crisis. I just

20  want to make sure we are talking about the same

21  issues.

22      There also has been under Workmen's

23  Compensation and under the contract that

24  Officer Young continues to operate under, in order

25  for him to get another job, he has to have the

1   approval of the department.  And he has sought that

2   in the past about four years ago there was a

3   rehabilitation program he tried get enrolled in to

4   become an investigator so he could continue in the

5   line of police work.  The agency and the department

6   were never able to get together on that so he was

7   not able to take advantage of that.

8          Finally, this past Christmas season after

9   the Workman's Compensation Bureau made their

10  ruling, they did allow him to do some holiday work

11  outside of the police department.

12         Essentially from the day he was injured

13  until today, Officer Young has been ready, willing

14  and able and indicated the desire to go back to

15  work.  Also since that time, there have been

16  light-duty assignments that other officers

17  conducted either on a full-time or part-time basis,

18  and that Officer Young was well capable of

19  handling.  There has been a position involving

20  follow-up investigations which involves phone

21  calls, interviewing, paperwork, all of which has to

22  be done in relation to each police officers's work

23  and is considered not a high priority.  Individuals

24  have performed that on a full and part-time basis.

25  And with those type of reasonable accommodations,

1   Officer Young could have been working this entire
2   period of time.
3            I also believe that with regard to the
4   stun gun, it is no longer a felony to carry a
5   stun gun.  And I do have a copy of enrolled Senate
6   Bill 809, which according to legislative counsel's
7   office of the Michigan Senate, was adopted on, I
8   want to say July 25, signed into law and is in
9   effect as we speak today.
10           It was presented to the governor on
11  July 22.  Governor Engler signed it July 25th at
12  10:35 p.m., and it was filed immediately or filed
13  with the Secretary of State at 2:19 p.m. on
14  July 26th.  And it was given immediate effect.  So
15  there has been a change in the law on the stun gun.
16           MR. ST. CHARLES:   Senate bill number
17  again?
18           MR. OSETEK:   809, and I do have copies.
19  I didn't know how to count the number of Board
20  members, but I do have copies.  And I have a copy
21  of the legislative web site, which shows when the
22  particular items happened.
23           And I know Mr. Muskovitz wasn't intending
24  to mislead you.  I am sure he wasn't aware this
25  happened in the past week, past several days.

```
 1              The reason a stun gun was raised by
 2    Officer Young in his letter to the Township or to
 3    the department asking for that accommodation as you
 4    may or may not know, he was injured doing take down
 5    exercises in a training class and had suffered
 6    lumbar injuries.  And with a stun gun if there was
 7    someone who needed to be taken down, he would not
 8    have to wrestle with them.  He would be able to use
 9    a stun gun.  That would enable him to do virtually
10    all of the functions according to his physician.
11    And his physician was the one who brought up, if
12    you could get a stun gun, that would enable you to
13    do virtually all of the steps that a regular police
14    officer does.
15              (Discussion held off the record.)
16              MR. OSETEK:   Thank you very much.
17              MR. ST. CHARLES:   I had to ask counsel
18    for a little procedural guidance.  You realize this
19    is the first time we have done this in Green Oak
20    Township.
21              Mr. Muskovitz, if you are ready to
22    proceed.
23              MR. MUSKOVITZ:   There was -- before I
24    call my first witness, Mr. Osetek and Mr. Connelly
25    and I had a brief discussion before the hearing
```

1   where there was some, I am not sure, actually.  We

2   discussed the possibility of since we have a court

3   reporter getting a transcript for the Board to

4   consider, and there is some discussion about the

5   possibility of filing a post hearing brief, if that

6   would be appropriate given some of the legal,

7   besides factual issues, some of the legal issues.

8   It might be appropriate for us to address those

9   issues at a later time because there may be some

10  authority both sides want to cite to the Board, so.

11          MR. ST. CHARLES:   Okay.

12          MR. MUSKOVITZ:   I would call as my

13  witness, Chief Robert Brookins.

14          MR. ST. CHARLES:   Chief Brookins, if you

15  could come forward and be sworn in.

16          MR. SEDLAK:   Raise your right hand.

17               *      *      *

18   C H I E F   R O B E R T   B R O O K I N S

19  was called as a witness, and after having been

20  sworn, was examined and testified as follows:

21          MR. SEDLAK:   Do you solemnly swear to

22  tell the truth, whole truth and nothing but the

23  truth so help you God?

24          THE WITNESS:   I do

25                  EXAMINATION

```
 1          BY MR. MUSKOVITZ:

 2     Q    Could you state your name and spell it for the

 3          record, please?

 4     A    Robert Louis Brookins.

 5                   The spelling of last name is B-, as in

 6          boy, r-o-o-k-i-n-s

 7     Q    And what is your position with the -- are you

 8          employed by the Green Oak Township Police

 9          Department?

10     A    Yes, I am.

11     Q    Your position?

12     A    Chief of police.

13     Q    How long had you had that position?

14     A    March 16, 1992.

15     Q    Did you hold any other positions with the Green Oak

16          Township Police Department?

17     A    No, I did not.

18     Q    Are you familiar with officer Larry Young?

19     A    Yes, I am.

20     Q    Do you know approximately when he was hired by the

21          department?

22     A    1 believe June of 1981.

23     Q    Do you know when he last performed duties as a

24          police officer for the department?

25     A    December 19, '92.
```

1   Q   December?

2   A   December.

3   Q   And what was the cause of his not working at that

4       time?

5   A   His doctor put him on disability after the interval

6       when he was on light duty after being injured in a

7       training exercise in August of 1992.

8   Q   And what has Mr. Young's status been with the

9       department since December of 1992?

10  A   Inactive.

11  Q   He received Workers' Compensation?

12  A   Yes, he did.

13  Q   And do you know until about what time he received

14      benefits?

15  A   October 2001.

16  Q   Were his benefits discontinued following or do you

17      know why his benefits were discontinued?

18  A   A decision by the administrative law judge by the

19      Workers' Compensation Bureau of the State of

20      Michigan.

21  Q   I have had marked as Exhibit No. 1 a copy of that

22      decision.

23              Do you have a copy of that in front of

24      you?  Chief, do you have a copy of that decision?

25  A   Yes, I do.

1  Q   If you could turn to page three, the finding

2      section, please.

3  A   Yes.

4  Q   If you could testify or read what the findings

5      were.

6  A   "I find the defendant has established by a

7      preponderance of the evidence that plaintiff no

8      longer suffers a work related disability and that

9      any problems he currently suffers are the result of

10     degenerative condition not related to the work he

11     was doing at the time of his injury.  Defendant's

12     petition to stop payment of benefits is granted".

13 Q   Has Mr. Young worked at all for the department

14     since December 19, '92?

15 A   No, he was not.

16 Q   Has he requested he return to work?

17 A   Yes, he was.

18 Q   Has he made a written request?

19 A   He made two written requests.  One in May 2001, and

20     another in June of 2002.

21 Q   I show you what I marked as exhibit -- first I move

22     for introduction of Exhibit No. 1.

23          MR. OSETEK:   No objection.

24 Q   (Continuing by MR. MUSKOVITZ):   You have what I

25     marked as Exhibit No. 2, the May 2, 2001 letter?

1    A    Yes.

2    Q    Did you receive that letter?

3    A    Yes, I did.

4              MR. MUSKOVITZ:   I move for introduction

5    of Exhibit No. 2.

6              MR. OSETEK:   No objection.

7              MR. ST. CHARLES:   We receive the exhibit

8    as marked, one and two.

9    Q    (Continuing by MR. MUSKOVITZ):   If you look at

10   what I marked as Exhibit No. 3, can you identify

11   that, please?

12   A    It is a letter to my attention from Mr. Young dated

13   June 7, 2002.

14             MR. MUSKOVITZ:   I move for introduction

15   of Exhibit No. 3.

16             MR. OSETEK:   No objection.

17             MR. ST. CHARLES:   We will receive the

18   exhibit as marked.

19   Q    (Continuing by MR. MUSKOVITZ):   Did you grant

20   Mr. Young's request to return to work?

21   A    No, I did not.

22   Q    And why not?

23   A    Mr. Young is no longer certified as a police

24   officer in the State of Michigan.  And the

25   conditions and limitations he requested do not

Page 26

1       exist in a position of the Green Oak Township

2       Police Department.

3   Q   Is it a prerequisite in working for the township

4       police department that an individual be a certified

5       police officer?

6   A   Every full-time officer with this agency is an

7       MCOLES certified police officer.

8   Q   And is that a requirement of the State statute a

9       police officer be certified?

10  A   Any officer who has the ability to effectuate law

11      enforcement powers has to be certified as a police

12      officer.

13  Q   Can you look at what I identified as Exhibit No. 4,

14      and if you can identify that, please?

15  A   It is a copy of the Michigan Compiled Laws

16      Annotated, Michigan State Police commissioning the

17      commission of Law Enforcement Standards Act.

18          MR. MUSKOVITZ:   Move for the

19      introduction of Exhibit No. 4.

20          MR. OSETEK:   The same as the other

21      statute?

22          MR. MUSKOVITZ:   There is reference in

23      the statute to the requirement of being certified.

24          MR. OSETEK:   Okay.   No objection.

25          MR. ST. CHARLES:   We will receive the

1      exhibit as marked.

2   Q   I would like to direct your attention to page 13 of

3      that document.

4   A   Yes.

5   Q   And specifically, Section 4, about two-thirds the

6      way down.

7   A   No. 4 reads:  Except as otherwise provided in this

8      section a regularly employed person employed on or

9      after January 1, 1977, as a member of the police

10      force having a full-time officer is not empowered

11      to exercise all the authorities of a police officer

12      in the State or be employed in the position which

13      the authority of a police officer inferred by

14      statute unless the person has received

15      certification under Section 9A(1).

16   Q   And who is responsible for providing certification

17      to candidates or employees for the police

18      department?

19   A   The Michigan Commission on Law Enforcement

20      Standards, formally known as MLEOTC, Michigan Law

21      Enforcement Officer Training Counsel.

22   Q   Could you give those initials for the court

23      reporter?

24   A   M-L-E-O-T-C.

25   Q   Was Larry Young ever a certified police officer?

```
 1   A   Yes, he was.

 2   Q   And you indicated he is not currently certified?

 3   A   That is correct.

 4   Q   Were you ever notified by MCOLES to this effect?

 5   A   Yes, I was.

 6   Q   And I direct your attention Exhibit 5.

 7             Is that -- if you could identify what

 8       that is.

 9   A   That is a letter addressed to my attention dated

10       May 21st, 1996, from the evaluation certification

11       section of the Michigan Law Enforcement Officers

12       Training Counsel at the time, which indicates

13       Mr. Young has lost his certification.

14             MR. MUSKOVITZ:   Move for the

15       introduction of Exhibit No. 5.

16             MR. OSETEK:   I object, hearsay

17       statement.

18             MR. ST. CHARLES:   The objection is

19       noted.

20             For the record, we will allow it to be

21       received as marked.

22   Q   (Continuing by MR. MUSKOVITZ):   There is reference

23       in the letter that you made a request to learn of

24       his status; is that correct?

25   A   That is correct.
```

1   Q   Can you look at what has been marked as

2       Exhibit No. 6.  Can you identify that?

3   A   A letter authored by myself dated May 21st, 1996,

4       addressed to the Michigan Law Enforcement Training

5       Counsel asking them for a decision related to his

6       police certification.

7               MR. MUSKOVITZ:   Move for introduction of

8       Exhibit No. 6.

9               MR. OSETEK:   No objection.

10              MR. ST. CHARLES:   We will receive the

11      exhibits as marked.

12  Q   (Continuing by MR. MUSKOVITZ):   In Exhibit No. 5,

13      there is reference to the fact that if Mr. Young

14      were to return to work, you would have to complete

15      the waiver of training process.

16              Are you familiar with that reference in

17      the letter?

18  A   In the last paragraph of the letter dated May 21st,

19      1996, it refers to, he must successfully complete

20      the waiver of training process.

21  Q   In order to do that, would he have to comply with

22      all the certification requirements of a new

23      officer?

24              MR. OSETEK:   Objection, foundation.

25  Q   (Continuing by MR. MUSKOVITZ):   Do you know what

```
 1        the -- let me rephrase.
 2                Do you know the certification
 3        requirements for a new officer?
 4   A    A new officer has to attend a full academy, which I
 5        believe consists of approximately 500 hours of
 6        instruction.
 7   Q    As part of the waiver of training process, do you
 8        know whether Mr. Young would have to go through
 9        that training program?
10   A    No, he would not.
11   Q    Are there other requirements that he would have to
12        meet in order to become recertified?
13   A    Yes.
14   Q    And do you know what those are?
15   A    Bear with me one moment.
16   Q    Let me ask, are there performance exams that an
17        individual would have to take in order to become
18        recertified?
19                MR. OSETEK:   Objection, leading.
20   A    He is required to make application with MCOLES.
21                MR. ST. CHARLES:   Can I interrupt?
22                I note the objection for the record.
23                Go ahead.
24   A    He would have to make application to MCOLES to be
25        eligible for their waiver of training program.
```

1    Q    (Continuing by MR. MUSKOVITZ):    If you could look
2         at what I marked has Exhibit No. 7.
3    A    Yes.
4    Q    Can you identify this document, please?
5    A    It is entitled, "Officer Recertification,
6         Chapter V - Unit 1, Administrative Law, Michigan
7         Commission on Law Enforcement Standards."
8    Q    And it applies to officer recertification under
9         MCOLES?
10   A    Yes.
11   Q    If you could look at page five of that document,
12        Rule 6?
13   A    Rule 5 is captioned, "Competence and Performance
14        Examinations."
15   Q    Is that Rule 5 or 6?
16   A    That is Rule 6.
17   Q    Okay.  That is one.
18   A    No. 1, Written examinations shall administered by
19        the Commission's staff to determine the candidates
20        competence in the functional areas defined in the
21        basic police training program.
22             No. 2, Performance examinations may be
23        administered for firearms defensive tactics,
24        precision driving and other skills.
25             No. 3, Competency shall be demonstrated

1    on each test to successfully complete the Waiver of
2    Mandatory Training Program.
3  Q  And if -- of the functional areas that were
4    identified or referenced in Rule 6, are those
5    identified in Rule 5?
6  A  Yes, they are, under the caption, "Waiver of
7    Mandatory Training program; hours; content and
8    scope; modification."
9  Q  Okay.  Does the department employ any full-time,
10    noncertified police officers?
11  A  No.
12  Q  Based upon the fact Mr. Young is not a certified
13    police officer, is he eligible to return to duty
14    with the department?
15  A  No.
16  Q  Aside from the lack of certification, is there
17    another reason Mr. Young is not qualified in your
18    opinion to return to work as a police officer?
19  A  Mr. Young wants to function without contact in
20    aggressive situations with citizens, criminals.  He
21    wants to be excluded from repetitive lifting over
22    35 pounds, excluded from repetitive bending and
23    twisting actions.
24       And prior to me listening to your open
25    statements, in his May 2, 2001, letter and in his

1    June 7, 2002 letter he wanted to carry an electric

2    stun gun.

3 Q  Are there any officers in the department that carry

4    a stun gun?

5 A  No.

6 Q  Based upon the conditions Mr. Young attached to his

7    return-to-work, May 2001 letter, do you believe he

8    can perform all the essential functions of a

9    Green Oak Township police officer?

10        MR. OSETEK:   Objection, foundation.

11 A  I do not believe he can.

12 Q  There has been an objection as to foundation.

13        MR. ST. CHARLES:   The objection again

14    will be noted for the record.

15 Q  (Continuing by MR. MUSKOVITZ):   Are you familiar

16    with the functions performed by a Green Oak

17    Township police officer?

18 A  Yes, I am.

19 Q  Does MCOLES publish a list of police officer

20    essential job functions?

21 A  Yes, it does.

22 Q  Before we move into that, I don't know if I moved

23    for introduction of Exhibit No. 7?

24        MR. ST. CHARLES:   No, you did not.   I

25    was going to ask.

Page 34

1        MR. MUSKOVITZ:   Always have at least one

2    you forget.

3        So I move for introduction of

4    Exhibit No. 7.

5        MR. OSETEK:   No objection.

6        MR. ST. CHARLES:   It will being received

7    as marked.

8        I had it marked.

9    Q   If you can look to at Exhibit No. 8.

10   A   Yes.

11       It is captioned "Michigan Commission On

12   Law Enforcement Standards," "Essential Job

13   Functions and Physician's Certification".

14       Second caption is, "General Information

15   for Law Enforcement Agencies and Health Care

16   Professionals".

17       Opening paragraph indicates "Essential

18   Job Functions" and the purpose of this document --

19   Q   Does the document indicate the reason why the

20   commission compared the list of job functions?

21   A   Prepared it specifically and identified in the

22   first paragraph, "to assist law enforcement

23   agencies and health care professionals in assessing

24   a candidates medical fitness to safely and

25   efficiently perform significant job tasks with or

1   without reasonable accommodation".

2 Q And did the commission describe these functions in

3   any way in this document?

4 A They went further to say this partial list was

5   developed by the commission based upon -- I am

6   sorry, "based on a state wide job analysis of the

7   police patrol officer position and represents

8   certain 'core' job tasks that pertain to all

9   entry-level law enforcement officers, regardless of

10   department size or type".

11 Q Have you reviewed these job functions?

12 A Yes, I have.

13 Q Are these job functions performed by police

14   officers in your department?

15 A Yes, they are.

16 Q It is important that your police officers be able

17   to perform all these functions?

18 A Yes.

19 Q According to the restrictions requested by

20   Mr. Young, particularly the issue that he, in his

21   letter that he, where he is saying, I would like to

22   renew my prior request of accommodations under

23   A.D.A., I am requesting accommodations in the form

24   of carrying an electric stun gun in assignment of

25   duties cognizant of limitations of unnecessary

1   repetitive lifting over 35 pounds, repetitive

2   bending and twisting actions and lateral assignment

3   of duties recognized primarily as preventative

4   rather than aggressive-duty assignments.

5            Particularly with the issue of

6   aggressive-duty assignments, are there any

7   functions of the 21 listed in the MCOLES essential

8   job duties you believe directly or indirectly could

9   involve aggressive-duty assignments?

10  A   Yes.

11  Q   Could you identify those?

12  A   Specifically No. 1, affect and arrest forcibly if

13  necessary using handcuffs and other restraints.

14            No. 2, climb over obstacles; climb

15  through openings; jump down from elevated surfaces;

16  jump over obstacles, ditches and streams; and crawl

17  in confined areas to pursue, search, investigate

18  and/or rescue.

19            Fifth one, operate an emergency vehicle;

20  during the day and night; emergency and pursuit

21  situations involving speeds of excess of posted

22  limits, while exercising due care and caution; and,

23  in congested traffic, unsafe road conditions, and

24  environmental conditions such as fog, smoke, rain

25  ice and snow.

1    Q    Excuse me.

2         Before you move on, that function in and

3         of itself, driving a vehicle may not be considered

4         an aggressive job or an aggressive function. But

5         could it under some circumstance lead to a

6         situation that would require aggressive action by a

7         police officer?

8    A    I think every time you put a police car in some

9         type of high speed maneuver, that is an aggressive

10        action, whether you are trying to locate a traffic

11        violator, respond to a call of emergency.

12   Q    And could it result in, after apprehending somebody

13        or reaching the designated location, then result in

14        actions that would require aggressive-duty

15        assignments or aggressive activity?

16   A    Yes.

17   Q    Were there others in this list?

18   A    If 1 can continue, No. 6, load, aim and fire

19        handguns, shotguns and other agency specific

20        firearms from a variety of body positions,

21        situations that justify the use of deadly force

22        while maintaining emotional control under extreme

23        stress.

24        No. 12, enter and exit vehicles quickly,

25        perform rescue operations, pursue a suspect or

1      answer emergency call.

2                    No. 14, perform tasks which require

3      lifting, carrying or dragging people or heavy

4      objects while performing arrest, rescue or general

5      patrol functions.

6                    No. 15, perform searches of persons which

7      involve touching and feeling of potential weapons

8      of and contraband.

9   Q  With respect to that, that in and of itself would

10     not necessarily seem to be an aggressive

11     situation.

12                   Could it sometimes be an aggressive

13     situation?

14  A  it could very quickly escalate into an aggressive

15     situation.  Individual may have contraband, may try

16     to run on you, may try to fight with you.

17  Q  Are there any others in this list?

18  A  No. 17, pursue fleeing suspects on foot, both day

19     and night in unfamiliar terrain.

20                   No. 19, subdue resisting subjects using

21     hands and feet while employing defensive tactics,

22     maneuvers or approved non-lethal weapons.

23                   No. 20, use body force to gain entrance

24     to barriers to search, seize, investigate and/or

25     rescue.

1                MR. MUSKOVITZ:   Move for introduction of

2    Exhibit No. 8.

3                MR. OSETEK:   I would like to Voir Dire

4    the witness on this.

5                MR. ST. CHARLES:  Okay

6                   V O I R   D I R E

7    By: MR. OSETEK:

8   Q  Chief Brookins, you indicated this applies to

9      entry-level law enforcement officers; is that

10     correct?

11  A  I believe the Michigan Law Enforcement Standards

12     states this is required of all officers seeking

13     certification.

14  Q  That is not indicated on Exhibit No. 8, is it?

15           This talks about entrly-level law

16     enforcement officers?

17  A  First sentence states, listed below are some

18     essential job functions pertaining to the

19     entry-level law enforcement officer position.

20  Q  This is not a list having to do with

21     recertification; is that correct?

22  A  Be a question better posed to MCOLES.

23  Q  You don't know -- you can't point to anything in

24     this document that shows this is the

25     recertification list, isn't it?

1        MR. MUSKOVITZ:   For the record, we were
2    not tying this in as part of the recertification
3    process, but indicating these were essential job
4    functions of a police officer identified by MCOLES.
5        MR. ST. CHARLES:   Noted.
6        MR. OSETEK:   Pardon?
7        MR. ST. CHARLES:   Noted.
8        MR. OSETEK:   Which part?
9        MR. ST. CHARLES:   All parts.
10        MR. OSETEK:   Okay.   I save the rest --
11        I object to the introduction of Exhibit 8
12    as not applying to recertification.
13        MR. ST. CHARLES:   We will certainly note
14    that objection for the record, and we will allow it
15    in as marked.
16  Q    (Continuing by MR. MUSKOVITZ):   Chief, whether or
17    not this is part of the recertification process,
18    you believe that the, the things of these functions
19    are functions that are required of a department
20    police officer?
21  A    I believe they are essential for all the officers
22    in this agency to be able to do.
23  Q    There is a reference in the beginning of this
24    document, this listing was prepared by the
25    Commission on Law Enforcement Standards to assist

1    law enforcement agencies and health care

2    professionals in assessing the candidates medical

3    fitness to safely and officially perform

4    significant job tasks with or without reasonable

5    accommodation.

6             If an individual is seeking

7    recertification by MCOLES, is part of that process

8    a requirement that they be, have a health care

9    professional examination?

10            MR. OSETEK:   Objection, foundation.

11   A   Yes.

12            MR. ST. CHARLES:   We note the objection.

13            MR. OSETEK:   Objection, foundation.

14            MR. ST. CHARLES:   Mr. Muskovitz,

15   proceed.

16   Q   (Continuing by MR. MUSKOVITZ):   Are department

17   sworn personnel or officers issued department

18   weapons?

19   A   Yes, they are.   They issue a SIG, S-a-u-e-r, I

20   believe, 40 caliber automatic handgun.

21   Q   In order to be certified, a certified police

22   officer, does the commission require sworn

23   personnel achieve and maintain a certain level of

24   handgun and shotgun marksmanship proficiency?

25   A   Yes.

1   Q   I would move --- could you identify exhibit, what

2      has been marked as Exhibit No. 9?

3   A   It is what I know and believe to be the firearms

4      requirements for the Michigan Commission on Law

5      Enforcement Standards for firearms, as well as

6      shotguns.

7   Q   Are these the requirements followed by the

8      department?

9   A   Yes.

10             MR. MUSKOVITZ:   I move for introduction

11      of Exhibit 9.

12             MR. OSETEK:   No objection.

13             MR. ST. CHARLES:   Exhibit is received as

14      marked.

15   Q   (Continuing by MR. MUSKOVITZ):   As part of his

16      request for an accommodation, did Mr. Young request

17      he be allowed to carry and use an electric stun

18      gun?

19   A   Yes.

20   Q   Mr. Osetek has indicated or produced information to

21      the effect that the, what has been marked as

22      Exhibit No. 10 has been repealed this past week.

23             I have marked this as No. 10.  I move for

24      its introduction at this time, recognizing that

25      there may be subsequent amendment to that statute.

1          But just for the record, I move for

2     introduction of No. 10.

3          MR. OSETEK:   I object to the

4     introduction of Exhibit No. 10, as it is no longer

5     the statute in the State of Michigan relating to

6     stun guns.  It is not a felony to carry a stun gun

7     if you are within one of the categories of the new

8     law.

9          Therefore, I don't believe it is

10    relevant.

11         MR. ST. CHARLES:   Mr. Muskovitz also

12    noted he recognizes there may be some changes, too.

13         MR. MUSKOVITZ:   Actually, so the record

14    is not confused, I will withdraw Exhibit No. 10 at

15    this time.

16         To the extent I think it is relevant, I

17    can make reference to it.  It is a public statute,

18    so I do not need to have it as an exhibit.

19         So it does not lead to any confusion on

20    the record, I withdraw it at this time.

21         MR. ST. CHARLES:   Objection.

22         Still mute?

23         MR. OSETEK:   That is an interesting

24    question.

25         MR. ST. CHARLES:   We will remove Exhibit

1          10.
2                    MR. OSETEK:   You are much more polite
3          than most of the judges.
4                    MR. ST. CHARLES:   On-the-job training, I
5          guess.
6                    MR. MUSKOVITZ:   I second that comment,
7          by the way.
8     Q    (Continuing by MR. MUSKOVITZ):   Are you familiar
9          with stun guns?
10    A    I have a limited knowledge of them.
11    Q    Based upon that knowledge that you have, do you
12         believe that it would be a reasonable alternative
13         to have an officer use a stun gun in any and every
14         situation in lieu of using aggressive police
15         tactics?
16                   MR. OSETEK:   Objection, foundation and
17         it calls for speculation.
18                   MR. ST. CHARLES:   We note the objection
19         for the record.
20                   MR. OSETEK:   All right.
21                   If I may explain on the record my
22         objection.
23                   The foundation objection is, the chief
24         indicated he has limited knowledge about it.   So he
25         lacks the information to render an opinion.   And

```
 1          the speculation is, he is asking about some

 2          hypothetical situation that we are not faced with.

 3                    And therefore, I believe he is not

 4          qualified to render that type of opinion.

 5                    MR. MUSKOVITZ:    Let me try a different

 6          approach.

 7    Q     (Continuing by MR. MUSKOVITZ):    Have you seen a

 8          stun gun?

 9    A     Yes, I have.

10    Q     Do you know what they look like?

11    A     Yes.

12    Q     What do they look like?

13    A     Two versions as I know, one was a phaser type of

14          weapon, which has two prongs on it where you

15          actually contact the individual.

16                    The other is a type of weapon that sends

17          out probes attached to the body surface and sends

18          an electric current to the individual.  They are

19          typically considered to be nonlethal force.

20    Q     Does it look like a gun?

21    A     No.

22    Q     What does it look like?

23    A     A hand-held device.

24                    They are very much like the recorder that

25          the stenographer has sitting in front of her.
```

1              (Chief indicating.)

2   Q   (Continuing by MR. MUSKOVITZ):   If an officer in

3       an aggressive situation were to reach for an object

4       that may appear to be a gun to a suspect, do you

5       have any concern or can you see a situation where

6       that could exacerbate a situation for the Officer

7       or the public?

8   A   There is more to police work, Mr. Muskovitz, than

9       just taking down people.

10              One phase of our profession is we may

11      have to take somebody's life as a result of

12      protecting ourselves or somebody else.   That has

13      traditionally been through mythology of utilizing a

14      firearm.

15              There are times the limitations of a stun

16      gun are 20 to 25 feet.

17              Lethal force can be as much as 100 feet

18      for a handgun.

19   Q   In addition to that, could you envision -- are

20      officers instructed -- when are officers instructed

21      to pull their handgun?

22   A   When they have fear for themselves, self-defense or

23      defending another individuals.

24              When you pull out a handgun be prepared

25      to utilize deadly force.

1  Q  Would you have any concern if an officer was

2     reaching for something that -- if an officer, for

3     example, Mr. Young were to have the access of

4     utilization of a stun gun and reach for the stun

5     gun, do you see the possibility that a suspect or

6     victim or another police officer may believe he is

7     reaching for a gun?

8  A  Yes.

9  Q  Could you envision a situation where that could

10     exacerbate a situation on the street or wherever

11     the officer is, would otherwise have to engage in

12     aggressive tactics?

13         MR. OSETEK:   Objection, calls for

14     speculation, not relevant to the issues here.

15         MR. MUSKOVITZ:   I think this is a police

16     chief who has been a chief of this department and

17     we have not gone into his prior history.  Perhaps I

18     should.  I think he certainly has a foundation to

19     lay as to his observations and experience as a

20     police officer and how it could impact his

21     department.

22         MR. ST. CHARLES:   I agree with that.

23         So I allow the questioning to continue,

24     but I note the objection.

25  Q  (Continuing by MR. MUSKOVITZ):   By the way, Chief

1      Brookins, how long have you been in law

2      enforcement?

3  A  The ripe young age of 18, in 1969.

4  Q  And where have you been employed prior to Green Oak

5      Township?

6  A  Both the Flint Police Department and Genessee

7      County Sheriff's Department.  For the short period

8      of time there were the two township police

9      departments in Genessee County.

10  Q  Back to the question as to any concern you may have

11      where an officer, in lieu of using aggressive, not

12      to the point where he would have to use a firearm,

13      but in lieu of aggressive take-down tactics or

14      whatever, would use a stun gun in place of those

15      tactics; is that a concern of yours?

16  A  Absolutely.

17  Q  Can you elaborate on that for the Board?

18  A  I believe officers, the public and victims have

19      become accustomed and have the expectations the

20      officer has to use deadly force, they can do so.

21           Deadly force is the last option that we

22      want to take.  The display of deadly force means

23      the officer has to be prepared to use it.

24           It is a necessary component of the

25      profession that we provide the public.

1    Q    Now if Mr. -- but I am not sure -- I want to direct

2         your attention to another aspect of the use of the

3         stun gun, not where it is being used because the

4         officer does not have a firearm with him, but where

5         an officer is going to be using the stun gun in

6         lieu of aggressive techniques because he is not

7         able to perform the aggressive techniques.

8              Do you think that is a reasonable

9         trade-off using a stun gun when aggressive

10        techniques would otherwise be called for?

11   A    No.

12   Q    Why is that?

13   A    Officer has to be prepared at all times to protect

14        themselves and the citizens they represent,

15        including the use of deadly force.  The stun gun is

16        not deadly force.

17   Q    If a situation does not call for deadly force but

18        does call for aggressive techniques as described in

19        some of the examples in, for example, a take down

20        or to where there is an altercation, do you feel

21        the use of a stun gun in those situations would be

22        a reasonable alternative from your department?

23   A    No.

24             MR. MUSKOVITZ:   If I could direct your

25        attention back, have I introduced all the exhibits

Page 50

```
 1        I identified?
 2                    MR. ST. CHARLES:   Except 11.
 3                    MR. MUSKOVITZ:   1 have not got to 11
 4        yet.
 5                    MR. ST. CHARLES:   Ten was removed.
 6                    We accepted everything up through that.
 7   Q    (Continuing by MR. MUSKOVITZ):   If I can direct
 8        your attention back to Exhibit No. 3 for a moment.
 9                    MR. ST. CHARLES:   Exhibit what?
10                    MR. MUSKOVITZ:   Three.
11   Q    (Continuing by MR. MUSKOVITZ):   You received this
12        letter from Mr. Young in June of this year?
13   A    Yes.
14   Q    And he was requesting -- renewed a request for
15        accommodations?
16   A    Yes.
17   Q    This letter does not specify the accommodations he
18        was requesting, does it?
19   A    No, it does not.
20   Q    Did you attempt to determine what they were?
21   A    Yes, I did.
22   Q    And how did you do that?
23   A    Spoke with Mr. Young on the phone, asked him to
24        clarify what he was asking for and he stated he was
25        asking for accommodations to the position of patrol
```

1     investigators or follow-up investigator.

2  Q  Did Mr. Young ever indicate to you that in the May

3     2001 letter he made reference to the stun gun?  In

4     your conversation with him in June of this year,

5     did he say anything about the stun gun at that

6     time?

7  A  No.

8  Q  And you indicated you spoke with him in June of

9     this year?

10  A  Yes.

11  Q  And he asked for an accommodation to the position

12     of follow-up investigator?

13  A  Yes.

14  Q  Did he indicate to you what he meant by that?

15  A  No.

16  Q  Do you have a position in the police department of

17     a follow-up investigator?

18  A  No.

19  Q  Has anyone in the department ever performed

20     follow-up investigator functions?

21  A  Yes.

22  Q  Do you have anyone currently assigned to do those

23     functions?

24  A  No.

25  Q  When was somebody in the department assigned to do

| | | |
|---|---|---|
| 1 | | those functions and for about how long? |
| 2 | A | I believe mid-1992 to the spring of 1993. |
| 3 | Q | How did it come about that someone was performing |
| 4 | | follow-up functions and by the way, how long had |
| 5 | | you been at the department at that time? |
| 6 | A | I started at the department on May 16, 1992.  The |
| 7 | | position assignment was made, I believe, in May or |
| 8 | | June of 1992. |
| 9 | Q | Tell me what was involved in the follow-up |
| 10 | | functions and how did it come about? |
| 11 | A | I found a great deal of concern about the mythology |
| 12 | | of the department following up complaints, |
| 13 | | communicating with complaints, talking to people on |
| 14 | | the phone, returning telephone calls, having a |
| 15 | | continuity of information so we had one person or |
| 16 | | two people knowing all the complaints being done on |
| 17 | | a 24-7 basis and that did not exist. |
| 18 | | I was distressed that people were making |
| 19 | | complaints to the department.  They were not |
| 20 | | getting contacts back from the officers because |
| 21 | | they were playing telephone tag.  So I thought I |
| 22 | | would, to benefit the situation and remedy some |
| 23 | | problems I was seeing immediately upon taking over, |
| 24 | | I would assign a patrolman to do follow-up |
| 25 | | investigations. |

```
 1    Q    Was this a priority for you when you joined the
 2         department?
 3    A    It wasn't initially, but shortly thereafter I saw
 4         so many inequities we had there and I felt it was
 5         something that would benefit us.
 6    Q    And did you feel that over time the problem you saw
 7         with respect to investigations and report running
 8         had been improved?
 9    A    There was an improvement.  Did it improve to the
10         point I would have liked it to have, no.
11    Q    Is that when you appointed this person to do these
12         functions?
13    A    Yes.
14    Q    And you said that the individual only performed
15         those for a period of several months or a half year
16         or so?
17    A    Approximately.
18    Q    How did it come about that process ended?
19    A    The officer that I assigned to the position was
20         Richard Walter, a patrolman at the time.  After the
21         assignment to the position, I went to the Board; I
22         requested another supervisor because at the time
23         there were only two supervision individuals, myself
24         and Sergeant Ronald Crowe.
25              The Board approved the creation of a
```

Page 54

```
 1        sergeant's position, and I made Sergeant Walter a
 2        sergeant.
 3   Q    Did he continue to do follow-up after he became a
 4        sergeant?
 5   A    Yes, he did.
 6   Q    For how long?
 7   A    Walter's job was never exclusively that of
 8        follow-up.  He did patrol and follow-up
 9        coordination.  He pulled shifts; he worked on the
10        road; he worked in uniform, worked in a marked
11        police car.  So essentially it was just another
12        assignment I added onto his as normal road patrol.
13   Q    But there appeared to be a period of time he
14        stopped doing the follow-up functions?
15   A    Yes.
16   Q    And was that sometime you say in 1993?
17   A    Sergeant Walter has helped in follow-up, as well as
18        supervision since 1993, but he has not done
19        follow-up as a primary responsibility.  And it was
20        not a primary responsibility because he did not
21        have enough time to do it all back from 1993.
22                  His primary job is that of supervisor.
23        He has helped officers, mentored them when they had
24        questions with complaints, but he has not done
25        exclusively follow-up investigations.
```

```
 1    Q    Is there any police officer who is assigned the
 2         functions of follow-up investigations?
 3    A    No.
 4              Every officer does their own follow-up.
 5    Q    But not any officer doing follow-up generally for
 6         other employees in the department?
 7    A    No.
 8    Q    Do you have a need for that in your department?
 9    A    I have a lot of needs in the department.
10    Q    You have that person doing that job now?
11    A    No.
12    Q    How many full-time, sworn personnel do you have in
13         the department?
14    A    Ten full-time patrolmen, two full-time sergeants
15         and myself as a full-time chief.
16    Q    Does the police department have any permanent
17         light-duty or restrictive positions?
18    A    No.
19    Q    Where are the patrol officers assigned?
20    A    Patrol?
21    Q    Is that the road patrol?
22    A    Yes.
23    Q    Given the size of the department, are all officers
24         required to perform all functions of a police
25         officer?
```

1    A    Yes.

2    Q    Are there times when there is only one police

3         officer on duty?

4    A    Unfortunately, yes.

5    Q    When there are more than one -- when there is more

6         than one police officer on duty are the officers

7         assigned two officers per car?

8    A    The only time two officers are together is because

9         there may be some inclement weather, special

10        circumstances or where they have to be doubled up.

11        It is more expedient to put two people in one

12        vehicle to go to one location in lieu of multiple

13        vehicles, police vehicles showing up at a single

14        location.

15   Q    If Mr. Young were employed as a police officer and

16        did not have to perform the jobs you described

17        earlier, the essential functions you identified

18        from the MCOLES, do you believe he would pose a

19        threat, could pose a threat to the health and

20        safety of the public or other officers?

21   A    Pose a threat to himself, the public, other

22        officers and the surrounding communities.

23             We have a mutual aid agreement with our

24        surrounding neighbors where the officers are

25        expected to respond there if necessary.  There is

1    also other agencies who function within

2    Livingston County's Green Oak Township who come

3    here who expect an officer to be able to assist

4    them.

5  Q  In addition to the issue regarding mutual aid,

6    would you have a concern with respect to Mr. Young

7    performing as a police officer with limitations of

8    not being able to perform aggressive tactics?

9  A  I don't believe we would be able to provide mutual

10    aid to any other agency with those conditions.

11  Q  Exclusive of that, if he was called upon in the

12    course of his duties as a police officer within the

13    township, not as part of the mutual aid but

14    performing his duties for the citizens living or

15    passing through Green Oak Township, would you have

16    a concern with respect to him functioning in that

17    capacity if he were not able to engage in

18    aggressive tactics and techniques required of a

19    police officer?

20  A  Absolutely.

21         MR. MUSKOVITZ:   Before I pursue this

22    next line of  questioning, I want to make a

23    comment.

24         Mr. Osetek in his opening remarks made

25    reference to the fact that there has been a number

```
 1          of other issues or claims by Mr. Young against the
 2          Township in that this hearing here is dealing with
 3          the issue of the Veterans Preference Act.  And we
 4          agree with that and it is not my intent to get into
 5          details regarding those, but I want to preface my
 6          questions to the chief on this one area.
 7                    There is one matter that is somewhat
 8          similar in nature here which I believe is relevant
 9          to the issue of the department's obligation to
10          employ him in what would be a light-duty
11          assignment.  And that is the reason for pursuing
12          the next line of questioning.
13     Q    (Continuing by MR. MUSKOVITZ):   Do you know
14          whether Mr. Young ever raised the issue of being
15          assigned a light-duty assignment any other time
16          while he was on leave of absence or on Workers'
17          Comp.?
18     A    He did, and it was part of a lawsuit he filed in
19          Livingston County Circuit Court.
20     Q    Which county, I am sorry?
21     A    Livingston County.
22     Q    Was there a claim in that lawsuit for disability
23          discrimination?
24     A    Yes.
25     Q    Do you know, have you reviewed some of the
```

1         pleadings in that file?

2    A    I am sorry, your question again?

3    Q    Do you know what was the outcome of the disability

4         claim in that case?

5    A    Yes.

6    Q    What was the outcome?

7    A    There was a summary disposition of the lawsuit in

8         Circuit Court.

9    Q    On the disability claim?

10    A    Yes.

11    Q    Do you know whether that was appealed, that

12         dismissal was appealed?

13    A    Yes.

14    Q    And was there a decision by the Court of Appeals

15         regarding that?

16    A    Yes.

17    Q    I want to have you look at what was marked as

18         Exhibit No. 11.  I change that to Exhibit No. 10.

19             Can you identify that, please?

20    A    State of Michigan Court of Appeals decision,

21         Livingston County Docket 95-014387.  And there is a

22         date stamp on the last page of March 16, 1998.

23    Q    If you could read into the record the top paragraph

24         on the last page, please.

25             MR. OSETEK:  I object to the relevance