```
 1        of this opinion, unless we are going to go into all
 2        of the facts and all of the arguments and
 3        agreements between the attorneys involved in it.  I
 4        think it is misleading to cite to what the Court
 5        has indicated is an unpublished opinion and try and
 6        influence this Township Board with a piecemeal
 7        approach to a complicated case.
 8                   So I ask it not be admitted into the
 9        record and not be referenced.
10                   MR. ST. CHARLES:   We overrule the
11        objection and allow it.
12                   We will note the objection.
13   Q    (Continuing by MR. MUSKOVITZ):   If you could read
14        the top paragraph, please.
15   A    In the present case, plaintiff's request for
16        permanent light-duty assignment is not a reasonable
17        accommodation because it would impose an undue
18        hardship on defendant.  Both the positions of
19        patrol officer and sergeant investigator required
20        plaintiff to have the ability to apprehend
21        criminals by use of physical force.  To permit
22        plaintiff to hold one of these positions without
23        disability would undermine the effectiveness of the
24        police force.  Therefore, plaintiff's argument has
25        no merit.
```

1              (Brief pause.)

2              MR. MUSKOVITZ:   If I could just take the

3    indulgence of the Board for minute.

4              There was a rule I had considered

5    introducing and decided not to, and it may be

6    relevant at this time.   I want to see if I have it

7    with me.   So I want to see if can I find that.

8              (Brief pause.)

9              MR. MUSKOVITZ:   Can we take short

10   recess?

11             MR. ST. CHARLES:   I was going to suggest

12   that.

13             Stand in recess for a few minutes.

14             (Brief recess.)

15             MR. ST. CHARLES:   We are back on the

16   record.

17             If you would proceed.

18             MR. MUSKOVITZ:   I can mark these as an

19   exhibit.   We have to have it copied.   I don't have

20   it copied now.

21             I want to -- will you hear me okay here?

22  Q  (Continuing by MR. MUSKOVITZ):   Chief, I want you

23   to look at Rule 28.4158, responsibilities of the

24   employing agency.   And if you could look where I

25   highlighted here --

1        MR. MUSKOVITZ:   Let me ask Mr. Osetek, I

2    can make this an offer of proof.  It is basically

3    the recitation of some regulations from MCOLES.

4        Do you want me to do it through the

5    witness or can I read it into record?

6        MR. OSETEK:   You know, I think you can

7    read it into the record.  I think that would save

8    everyone time.

9        MR. ST. CHARLES:   I would agree.

10       MR. OSETEK:   If no one has any problems

11   with that.

12       MR. MUSKOVITZ:   I make this as

13   Exhibit No. 11, and we can get copies of it made,

14   but Rule 28.4158 of MCOLES Rules.

15       MR. GREEN:   We have that as part of

16   Exhibit No. 7, sir.

17       MR. MUSKOVITZ:   Part, but not all.

18       Rule 8 requires that before employing

19   candidate who has passed the waiver of mandatory

20   training program, the recertification program we

21   heard some testimony about, employing agency shall

22   do all the following:  Sub. 1A is fulfill the

23   requirements of 28.4103, except as provided for in

24   the rules.

25       48 -- I am sorry 28.4103, which you do

1   not have, is entitled hiring agency

2   responsibilities.  And it does apply, typically, to

3   the new officer, but it does apply by the reference

4   to the rule I just cited to somebody who is getting

5   recertified.  And the employing agency has to

6   certify the respective trainee meets the minimum

7   employment standard set forth in Rule 28.4102-a to

8   small i.

9           Rule 28.4102-a, this can only be done by

10   a government agency, is called medical selection

11   qualifications.  Person selected to become a law

12   enforcement officer pursuant to the provisions of

13   the act shall meet all the following medical

14   requirements.

15           Sub. E of that says be free from any of

16   the following which may tend to impair the

17   efficient performance of law enforcement officers

18   duties which might endanger the lives of others or

19   the law enforcement officer, the first sub point

20   underneath that is physical defects.

21           The point being, if there is a physical

22   condition that would prevent an officer from

23   performing the efficient performance of their

24   duties which endanger the lives of the officer or

25   others of the law enforcement officers.

1          So the point being, to be recertified one

2     has to show that they do not have any physical

3     conditions that would prevent them from doing all

4     those functions, because without being able to do

5     those functions and functioning as a police

6     officer, they may endanger themselves or others.

7          And I will introduce that through a

8     convoluted set of rules I did not think was going

9     to be an issue here, so I did not have it as an

10    exhibit.  But I will provide that to the Board and

11    counsel after this hearing.

12          MR. ST. CHARLES:   Are you moving to add

13    that as an exhibit?

14          MR. MUSKOVITZ:   I move to have those

15    relevant rules as combined into Exhibit 11.

16          MR. ST. CHARLES:   Is there an

17    objection?

18          MR. OSETEK:   No.

19          MR. ST. CHARLES:   Okay.  Everyone will

20    be made a copy at the end of the proceeding

21    tonight?

22          MR. MUSKOVITZ:   Yes.

23          MR. ST. CHARLES:   It will be received as

24    Exhibit 11 as marked.

25    Q     (Continuing by MR. MUSKOVITZ):   Chief Brookins,

```
 1        were you aware of that requirement?

 2   A    No.

 3   Q    They had to be recertified?  A recertified

 4        individual had to be examined by a physician?

 5   A    I was aware of that requirement.

 6   Q    And they had to meet certain standards for the

 7        medical exam?

 8   A    Yes.

 9   Q    Just to recap, is Mr. Young currently certified?

10   A    No, he is not.

11   Q    Based upon the limitations he identified in his May

12        letter, May 2001 letter to you, can he perform all

13        the functions of, essential functions of a police

14        officer identified by MCOLES?

15   A    No, he cannot.

16   Q    Does the department have any full-time, light-duty

17        assignments?

18   A    No, it does not.

19   Q    Do you believe it would be an undue heartship to

20        allow Mr. Young to perform with the restrictions he

21        identified?

22   A    Yes.

23   Q    Based on these factors, do you have a

24        recommendation regarding Mr. Young's employment?

25   A    I recommend we terminate him from employment.
```

```
 1                    MR. MUSKOVITZ:   Thank you.

 2                    I have no other questions.

 3                    MR. ST. CHARLES:   Mr. Osetek, do you

 4         wish to cross?

 5                    MR. OSETEK:   Certainly.

 6                    Our discussion off the record before we

 7         sat down here was how this was going to take a

 8         half-hour and we were all going to be home.

 9                    Obviously Mr. Muskovitz gets paid by the

10         hour or should if he isn't.

11                    MR. SEDLAK:   He is doing it for free, we

12         thought.

13                              EXAMINATION

14         BY MR. OSETEK:

15    Q    Chief Brookins, I have some questions for you.

16                    We have not met before, have we?

17    A    No, sir.

18    Q    I have not called or interviewed you or anything of

19         that nature?

20    A    Correct.

21    Q    You have not had the opportunity to stop me for any

22         civil or criminal infractions?

23    A    No, sir.

24                    MR. MUSKOVITZ:   Take a good look.

25                    MR. OSETEK:   I am going to have to
```

1    change cars.

2             MR. MUSKOVITZ:    I want to make sure that

3    answer was accurate.

4  Q  (Continuing by MR. OSETEK):    You have been the

5    chief of police since 1992?

6  A  Correct.

7  Q  Did you take a physical when you started here?

8  A  No, I did not.

9  Q  Do you have any physical limitations yourself?

10 A  No, I do not.

11 Q  Is it your testimony that all of the items on

12   Exhibit No. 8, all the requirements, essential

13   function requirements, you have been able to

14   provide those and can provide those yourself as you

15   sit here today?

16 A  Yes.

17 Q  And you have always been able to do that?

18 A  With an exception of a period of time I was on sick

19   leave, which I couldn't do it during that time,

20   yes, I can.

21 Q  But you were still a sworn officer while on sick

22   leave?

23 A  Yes, I was.

24 Q  How long were you on sick leave?

25 A  Approximately three and-a-half months.

Page 68

```
 1    Q    All right.  Now, you are not a physician; is that
 2         correct?
 3    A    Correct.
 4    Q    Okay.  And you have not examined Officer Young
 5         physically?
 6    A    Correct.
 7    Q    Looking at Exhibit 8, which I believe you have in
 8         front of you --
 9    A    Exhibit?
10    Q    Eight.
11              It is my understanding your testimony was
12         there were aggressive-duty assignments that you
13         believed Officer Young could not handle.
14              Was that your testimony?
15    A    Based upon the limitation he identified to me, that
16         is correct.
17    Q    And you contend that he cannot do No. 1?
18    A    Yes.
19    Q    Two?
20    A    Yes.
21    Q    Five?
22    A    Yes.
23    Q    Six?
24    A    Yes.
25    Q    Twelve?
```

| 1 | A | Yes. |
| 2 | Q | Fourteen? |
| 3 | A | Yes. |
| 4 | Q | Fifteen? |
| 5 | A | Yes. |
| 6 | Q | Seventeen? |
| 7 | A | Yes. |
| 8 | Q | Nineteen? |
| 9 | A | Yes. |
| 10 | Q | Twenty? |
| 11 | A | Yes. |
| 12 | Q | Did you ask him specifically if he could do any one |
| 13 | | of those? |
| 14 | A | No. |
| 15 | Q | Did you send him for a physical to have a physician |
| 16 | | determine if he could do any one of those? |
| 17 | A | No. |
| 18 | Q | You just decided on your own he is not capable of |
| 19 | | doing those? |
| 20 | A | I made that assessment based on the limitations he |
| 21 | | identified. |
| 22 | Q | But you haven't done any physical exam, and you |
| 23 | | have not asked him anything about those? |
| 24 | A | That is correct. |
| 25 | Q | And you have not had anybody else examine him to |

1          determine that?

2     A    That is correct.

3     Q    How much time have you spent with Officer Young in

4          the past 10 years since he was off on Workman's

5          Compensation?

6     A    Essentially on a day-to-day basis from March 16

7          until mid-December of '92.

8     Q    Since 1992?

9     A    Right.

10    Q    You have spent virtually no time with him, have

11         you?

12    A    That is correct.

13    Q    You don't have any personal knowledge about his

14         physical ability today?

15    A    That is correct.

16    Q    Now you testified, I believe, that the last time

17         Officer Young did work for the Township was in

18         December of 1992; is that correct?

19    A    Yes.

20    Q    Wasn't he called in to testify as a sworn officer

21         on behalf of the Township at a court proceeding

22         sometime after that?

23    A    Yes.

24    Q    So he was a sworn officer at the time he testified

25         on behalf of the Township?

1   A   To my recollection. I don't know which date and

2       time and event you are talking about.

3   Q   So that was in September 1993?

4   A   If he made a court appearance on behalf the

5       department or under subpoena in 1993, he would

6       still be a certified police officer.

7   Q   So when you sent your letter, I want to get the

8       right exhibit number here, Exhibit No. 6 -- no, 1

9       am sorry.

10              Looking at Exhibit No. 5 from the

11      Department of State Police, it says in your letter

12      you indicated Officer Young's last day of work as a

13      sworn officer was December 10, 1992.

14              Do you to see that?

15  A   Yes.

16  Q   That is not a true statement, is it?

17  A   MCOLES letter to me dated May 21st, 1996 --

18  Q   You did not understand my question?

19  A   I can't answer your question without citing this

20      particular memo.

21  Q   Either that is a true statement or not a true

22      statement.

23  A   Would you ask the question again?

24  Q   Sure.

25              The statement here, in your letter you

1        indicated Officer Young's last day of work as a

2        sworn officer was December 10, 1992. That is not a

3        true statement, is it?

4  A  His last day of work, his day of work was that day.

5  Q  But not his last day as a sworn officer, correct?

6  A  His last day as a scheduled officer. But as sworn

7        officer, he still had certification for two years

8        after his last date scheduled.

9  Q  So in effect, when the Michigan Department of State

10       Police was relying on your information, that was

11       all they were relying on when they issued their

12       letter that is Exhibit No. 5, correct?

13  A  Yes.

14  Q  And if any of that information is incorrect, the

15       basis for that letter is incorrect, isn't it?

16  A  MCOLES based their assessment on my request.

17  Q  On your request and on the information you provided

18       to them?

19  A  Yes.

20  Q  Did they ever send you a copy of a letter that they

21       sent to Officer Young indicating he was no longer

22       certified?

23  A  That they sent to Mr. Young?

24  Q  Officer Young.

25  A  I never received a copy from MCOLES that was

Page 73

1    directed to anybody other than myself.

2  Q  So as far as you know, they have never decertified

3    Officer Young, have they?

4  A  No.

5  Q  On October 20th of 1993, you informed Officer Young

6    he was suspended, didn't you?

7    MR. MUSKOVITZ:   What is the date again?

8    MR. OSETEK:   October 20, 1993.

9  A  I don't believe I ever told Officer Young he was

10    suspended.

11  Q  (Continuing by MR. OSETEK):   You required him to

12    turn in uniforms, keys, badges, other issued

13    equipment?

14  A  Based on my interpretation; his status was

15    inactive.

16  Q  Did you get a legal opinion on that at that time?

17  A  Not directly.

18  Q  Did you consult with the Township Board and have

19    them reach a decision?

20  A  I consulted with the township supervisor.

21  Q  But you suspended him on or about October 20, 1993?

22  A  I had him turn his equipment in.

23  Q  So he was never suspended back then?

24  A  I would not use the terminology suspended.

25  Q  Did you require Officer Young meet with Ron Crowe

1      and turn in all of his equipment?

2  A   I don't remember if I required Crowe to meet with

3      Young or Young to meet with Crowe.

4  Q   Are you familiar with Section 8 of the rules and

5      regulations regarding suspensions?

6  A   You have to show me the specific section.

7          You are talking about our rules and

8      regulations?

9  Q   Yes.

10         Let me refer to it.  I don't have

11     multiple copies, but under Section 8, suspensions,

12     Paragraph B, to surrender property.

13         In all cases of suspension, the suspended

14     member will immediately surrender the police badge

15     and all other property in his possession belonging

16     to the department to the suspending officer who

17     will, as soon as possible thereafter, deliver the

18     same to the chief of police to be held by impending

19     investigation.

20         Isn't that what he required Officer Young

21     to do back on October, about October 20th, 1993?

22  A  I required him to turn his equipment and uniforms

23     into the department.

24  Q   Did you ever do an investigation into any wrong

25     doing he had done?

```
 1    A    Related to that directive?
 2    Q    To anything.
 3    A    Yes, I did.
 4    Q    Relating to this directive on or about October 20,
 5         1993, did you do any investigation?
 6    A    Not related to that.
 7    Q    Was it your testimony that all of the police
 8         officers on the force are required to meet all of
 9         the Exhibit No. 8 requirements at all times?
10    A    I believe every officer should be able to do those
11         essential job functions.
12    Q    Is every officer on the department able to do those
13         essential job functions?
14    A    To my knowledge, yes.
15    Q    Now, you created the investigator or investigative
16         follow-up position.  That is correct, isn't it?
17    A    I made an assignment to that position.
18    Q    And hadn't you previous to making that assignment
19         asked the Township for an additional slot so you
20         could place somebody in that investigator's
21         position?
22    A    Not that I recall.
23    Q    And that position at that time was solely to
24         perform follow-up investigative duties?
25    A    No.
```

1   Q   No?

2   A   No.

3   Q   After his injury, did Officer Young ever inform you

4       he could perform the duties of investigation

5       follow-up?

6   A   With limitations and conditions.

7   Q   But he informed you of that after his injury?

8   A   Not -- I don't remember when he notified me.  It

9       may have been pursuant to his lawsuit in 1995.

10          But I became aware of what he was citing,

11      his limitations and conditions.

12  Q   The department did have him doing light duty for a

13      period of time after his injury, didn't they?

14  A   Yes.

15  Q   And they have had light-duty assignments for other

16      individuals that were under a disability?

17  A   There have been no patrolmen given light duty since

18      Mr. Young left in December of 1992.

19  Q   Has Officer Danforth been on light duty at anytime?

20  A   I stand corrected.

21          She was only light duty as a result of

22      maternity.

23  Q   So she was suffering under a disability?

24  A   She was suffering -- she was pregnant.  I don't

25      know if you want to call that suffering and

```
 1          disability.

 2    Q     I think the law recognizes it as a disability.

 3    A     I am not certain.

 4    Q     That was on more than one occasion, correct?

 5    A     She was pregnant to my recollection in late 1992,

 6          and then on a subsequent date after that.

 7    Q     So on two separate occasions the department placed

 8          her on light-duty work?

 9    A     Yes.

10    Q     Due to her medical condition?

11    A     Yes.

12    Q     And at that point in time is it your testimony she

13          could have performed all of the Exhibit 8

14          assignments that you believe are imperative for an

15          officer to perform?

16    A     For an officer completing full-time, full-duty, no

17          she could not.

18    Q     Was Sergeant Walter ever on light duty?

19    A     Sergeant Walter was on light duty.  I don't

20          remember the year he was.  His duty was restricted

21          on a day-to-day basis depending on the needs of the

22          department.

23    Q     But he was on light duty?

24    A     He is a sergeant, too, yes.

25    Q     For an indefinite period of time?
```

1    A    No, specific period of time.

2    Q    How long was that time?

3    A    I believe it was 60 days.

4    Q    Sergeant Crowe ever on light duty?

5    A    Sergeant Crowe had some surgery.  I don't remember

6         what year.  He came back without restrictions, and

7         I assigned him to a day-shift job working

8         administrative functions in the office.

9    Q    And how long was that assignment?

10   A    I am not certain.

11   Q    But he was essentially assigned light duty?

12   A    He was assigned administrative duties in the

13        office.  I don't call it light duty.

14   Q    Are there any of those functions he performed that

15        Officer Young would not be able to perform?

16   A    I can't even speculate.

17   Q    You didn't have trouble speculating a little

18        earlier.  Try and speculate now.

19   A    I can't speculate.

20   Q    Are you familiar with the Township Board's

21        resolution with regard to the Americans with

22        Disabilities Act?

23   A    Yes, I am now.

24   Q    I believe it was passed in 1993.

25             MR. OSETEK:   If I may approach.

1          Let me hand you what is Resolution I-93.

2          I don't know if we should mark this A or

3     12.

4          I don't know if the Board would like

5     copies of Resolution I-93?

6          MR. ST. CHARLES:   We have it.

7          MR. OSETEK:   I would assume so.   I

8     assume some of you were involved in passing it.

9          MR. ST. CHARLES:   No.

10          MR. GREEN:   No, that was nine years ago.

11          MR. SEDLAK:   The Board changed since

12     then.

13          MR. OSETEK:   You guys have term limits?

14          Term limits every election.

15          MR. ST. CHARLES:   Every four years.

16  Q   (Continuing by MR. OSETEK):   Is it your belief

17     that your actions in not providing light-duty work

18     for Officer Young is in compliance with the

19     Township of the Green Oak Resolution I-93 or I-93?

20  A   Please rephrase your question.

21  Q   Could you read I back, please?

22          (Record repeated by Reporter.)

23  A   I would defer to answering that question because I

24     have had counsel conversations with it since the

25     litigation with Mr. Young.   So I don't have an

1    answer I can give you that I have not discussed

2    with counsel, and counsel has not given me

3    direction.

4              MR. OSETEK:   Do you want to instruct him

5    not to answer the question?

6              MR. MUSKOVITZ:   Who are you referring

7    to?

8              THE WITNESS:   I am referring to

9    Mr. McGlinchey, who formally represented the

10   Township, and Mr. Greg Ulrich, U-l-r-i-c-h, who

11   represented the Township in litigation.

12             MR. ST. CHARLES:   Which neither are

13   here.

14             MR. MUSKOVITZ:   Do you understand what

15   question is asked?

16             THE WITNESS:   I don't specifically

17   understand the question.

18             I know this was discussed with counsel,

19   and he is asking me, essentially, do I know I

20   violated this resolution.  If that is the question,

21   I do not believe I violated the resolution.

22             MR. ST. CHARLES:   Is there a different

23   way you can phrase it?

24             MR. OSETEK:   Essentially I just, you

25   know, it is not a trick question.

```
 1    Q    (Continuing by MR. OSETEK):   I am looking at, as I
 2         understand it, you were the person who determined
 3         that Officer Young should be terminated as a result
 4         of this Veterans Preference Hearing, correct?
 5    A    No.  I am not making a determination.  I am making
 6         the recommendation.
 7    Q    You are making the recommendation.
 8              And the Township -- I mean we have a
 9         federal law, a state law.  The Township is also on
10         record with a resolution recognizing that certain
11         things, accommodations, what have you, need to be
12         made with regard to individuals with disabilities.
13              And what I am asking you is if you
14         believe your recommendation that Officer Young be
15         terminated is in compliance with the township
16         resolution?
17    A    I don't know if I am in a position to make that
18         judgement.  I don't believe that based upon the
19         limitations and conditions he is asking for that we
20         have a position we have to create to do so.
21         Therefore, I don't believe A.D.A., requires us to
22         create a position.
23    Q    I don't think other than your suggestion there be a
24         creation of position.  We heard a lot of testimony
25         of various light-duty assignments that have been
```

```
1        available in the past to other individuals.  And we

2        had your own testimony that you did, in fact,

3        create, if not a position what sounded pretty much

4        like a full-time assignment of a follow-up

5        investigator.

6                  And so I am asking you in light of the

7        testimony we already heard.  I am not asking you --

8        I don't believe anyone has asked you to create a

9        position.  It is to use available work assignments

10       or to enable Officer Young to come back to his

11       job.

12    A  I really, truthfully, cannot give you an opinion on

13       that.

14    Q  Fair enough.

15                  Let's talk a little bit about the stun

16       gun.  I think we heard probably more than we need

17       know about the stun gun, but one of the

18       accommodations that Officer Young suggested that

19       could be made was to enable him to use a stun gun

20       in conjunction with his police work, correct?

21    A  Yes.

22    Q  He didn't tell you he didn't plan on carrying a

23       regular gun, did he?

24    A  No.

25    Q  Has Officer Young ever failed his handgun
```

1          certification to your knowledge?

2   A   To my knowledge, no.

3   Q   He has a perfect record with regard to handgun

4          certification?

5   A   Can't speak to that.

6   Q   Do you have any reason to believe he could not pass

7          any handgun certification test today?

8   A   No.

9   Q   And there was never any of suggestion by

10         Officer Young that he did not plan on carrying a

11         handgun as a police officer?

12   A   That is correct.

13   Q   So all we heard about deadly force and all this

14         other stuff with regard to stun guns does not

15         really apply to this situation?

16   A   Except me as the policy maker in the department is

17         the one who decides what type of weapons the

18         officers carry.

19   Q   I understand that.  That is not the issue.

20              He never suggested he was not going to

21         carry a handgun?

22   A   He didn't suggest he wasn't.

23   Q   He never suggested he was not going to do it.  In

24         fact, he always carried one before when he was

25         working full-time, didn't he?

1   A   Yes.

2   Q   And you don't have any reason to believe he

3       wouldn't be certified in the handgun testing

4       procedures?

5   A   If he could successfully complete the requirements

6       of multiple positions, getting on the ground,

7       shooting from prone to kneeling position.

8   Q   You don't have any reason to believe he couldn't do

9       that?

10  A   I cannot make that assessment.

11  Q   Chief Brookins, do you recall when in December of

12      1993 -- 1992, Officer Young had a new child?

13  A   Yes.

14  Q   And at that time didn't you advise him not to use

15      sick time or vacation time after his son was born,

16      but rather to go to his doctor and ask to be taken

17      off on Comp.?

18  A   It was 10 years ago.  I don't remember my

19      conversation specifically with Mr. Young.

20  Q   Do you remember something generally like that?

21  A   The only thing I recall from Mr. Young was he

22      wanted to attend physical therapy while on duty and

23      be paid by the department.  I declined that request

24      saying that if he left for physical therapy, he had

25      to use personal time.

1  Q  Maybe you didn't understand my question.

2  A  Did you suggest or instruct Officer Young to ask to

3     be put out on Workmens' Comp. rather than use

4     vacation or sick time at the time his child was

5     born in December of '92?

6  A  I don't recall.

7  Q  Did you ever articulate a plan to anyone that if

8     Officer Young went off on Workman's Comp., you

9     would never allow him to return to duty?

10 A  I had a discussion with the case worker from

11    Workers' Comp., who stated I had no obligation to

12    create a position for Mr. Young.  I had a

13    conversation with Sergeant Crowe related to my

14    conversations with the Workers' Comp.

15    representative that I had no obligation to provide

16    him light duty.

17 Q  But did you say to Sergeant Crowe that if he goes

18    off on Comp., I am not going to let him back on

19    active duty?

20 A  If I said anything to Sergeant Crowe, I would have

21    said I had no obligation to let him return to light

22    duty, per the case worker from Workers' Comp.  And

23    the specifics of my conversation with him were

24    almost 10 years ago.

25 Q  Didn't you assert in a deposition in 1996 that that

```
 1              was a privileged communication and refused to
 2              answer that question or a similar question?
 3      A       I don't think I refused to answer the question.   I
 4              believe I stated I thought it was a privileged
 5              conversation with Sergeant Crowe.
 6      Q       And you didn't answer the question?
 7      A       I think I did answer the question.
 8      Q       Did you ever tell Officer Young or the Comp.
 9              specialist you would not let him return until he
10              was 100 percent?
11      A       I have had so many conversations with people
12              related to him since 1992, I don't recall if I
13              specifically told him or her.  I do know I went on
14              the recommendation and advice of the Workers' Comp.
15              representative that he did not have to be
16              accommodated in a light-duty position unless he was
17              fully able to return to work without restrictions.
18      Q       And that was with a Workmens' Comp. specialist?
19      A       My conversation was with a Workers' Comp.
20              specialist.  I may have talked to Mr. Young or an
21              attorney about it.  It was ten years ago, sir.
22      Q       Did you talk to anyone about it in the context of
23              the Veterans Preference Act and what that requires
24              you to do with regard to Veterans?
25      A       I wasn't aware of the Veterans Preference Act until
```

```
 1          our current counsel had the discussion with me
 2          about it.
 3     Q    After Officer Young turned in his equipment in
 4          September -- October of 1993, did you receive a
 5          call from the union indicating he was protesting
 6          that?
 7     A    Protesting what?
 8     Q    That he had to turn in his equipment.
 9     A    I don't remember having heard anything from the
10          union related to it.
11     Q    And I assume that the union was never notified
12          verbally or in writing that Officer Young was
13          suspended at or about that time?
14     A    Again, sir, I don't recall ever telling Mr. Young
15          he was suspended, so I wouldn't have had that
16          conversation, communication with him.
17     Q    Have you ever had any conversations with the union
18          about the status of Officer Young?
19     A    When you speak union, could you elaborate who you
20          are talking about?
21     Q    Well, I understand there have been several unions
22          during the tenure of yourself with regard to the
23          patrolmen?
24     A    Two of them,  Police Officers' Association of
25          Michigan, and Michigan Association of Police.
```

1    Q    And one was in for a short period of time when you

2         first started?

3    A    Yes.

4    Q    And was that the Police Offices of Michigan?

5    A    P.O.A.M., Police Officers Association of Michigan,

6         yes.

7    Q    After that it was the other union?

8    A    Michigan Association of Police, which is currently

9         the union.

10   Q    Have you had any discussions with either of those

11        two unions regarding the status of Officer Young?

12   A    I don't recall.

13             MR. OSETEK:    I would move for

14        introduction of Exhibit 12, which is the Township

15        Resolution into evidence.

16             MR. ST. CHARLES:    Is there an

17        objection?

18             MR. MUSKOVITZ:    No objection.

19             MR. ST. CHARLES:    To the resolution I-93

20        or I-93.

21             MR. OSETEK:    I also move the

22        introduction of Exhibit 13, which is the enrolled

23        Senate Bill No. 809.

24             And I have provided some copies.    I

25        included in mine, not in yours, is the Senate bill

1    history, which I would like to also make and

2    attachment to the bill.

3            It indicates when it was presented to the

4    governor, when it was approved, so you will have

5    the actual chronology of when things happened.  And

6    I would copy that if possible afterwards or I could

7    get it out here tomorrow sometime.

8            MR. ST. CHARLES:   Is there an objection

9    to either?

10           MR. MUSKOVITZ:   No.

11           MR. ST. CHARLES:   Forward these to the

12   clerk for distribution to the Board.

13           And we would receive Exhibits No. 12 and

14   13.

15           MR. MUSKOVITZ:   May I request, do you

16   want, I was going to do the same with Exhibit 11.

17           Do you want that tonight or can I forward

18   that at another date?

19           MR. ST. CHARLES:   Well, we can make

20   copies after this proceeding.

21 Q  (Continuing by MR. OSETEK):   Chief Brookins, are

22   you aware at a Township meeting on March 19, 1997,

23   the Township Board indicated that the general rules

24   apply to Officer Young, the general rules of the

25   department apply to Officer Young?

1   A   I think the general rules apply to the entire

2       department, not just to him.

3               MR. OSETEK:   I would move for

4       introduction of Exhibit No. 14.

5               I have four copies.  I don't know if

6       anyone would like them.

7               MR. MUSKOVITZ:   For the record, I note

8       these are unapproved Minutes of the Board as noted

9       on the top left-hand corner.

10              MR. ST. CHARLES:   So noted.

11              Is there an objection?

12              MR. MUSKOVITZ:   Not being the official

13      Minutes, if in is being introduced as the Minutes,

14      I do have an objection on that basis.

15              MR. ST. CHARLES:   Then we will receive

16      them as Exhibit No. 14 and note the objection for

17      the record.

18              MR. OSETEK:   Also, down at the bottom it

19      says, synopsis approved.  So there was some sort of

20      a ratification of this.  I don't know if you saw

21      that down in the corner.

22              MR. MUSKOVITZ:   Yes.

23              (Brief recess.)

24              (Discussion held off the record.)

25              MR. ST. CHARLES:   Are we ready to

1      proceed?

2              MR. OSETEK:   I think we are.

3  Q   (Continuing by MR. OSETEK):   Chief Brookins,

4      looking at the Veterans Preference in Employment

5      Act for the State of Michigan, with the exception

6      of the recent action with regard to Officer Young,

7      have you ever had any involvement with the

8      Veterans Preference Act?

9  A   No.

10 Q   Have you read it?

11 A   No.

12 Q   And yet you are the one here today that is

13     recommending in a hearing called under this Act

14     that Officer Young be terminated, correct?

15 A   In consultation with counsel, the request for a

16     Veterans Preference Hearing was made to the Board.

17 Q   Let me ask you a couple questions about the Act.

18              To your knowledge, is the reason that

19     Officer Young is -- was the attempt of

20     Officer Young to be removed from his position

21     because of any official misconduct he ever engaged

22     in?

23 A   No.

24 Q   Was the reason you are recommending that he be

25     removed from his position that he was involved in

```
 1        habitual, serious or willful neglect in the
 2        performance of duty?
 3    A   No.
 4    Q   Is the reason you are recommending that he be
 5        removed based on any knowledge or incidents of
 6        extortion that Officer Young was involved with?
 7    A   No.
 8    Q   Are you recommending that he be removed because he
 9        was convicted of intoxication?
10    A   No.
11    Q   Are you recommending that he be removed because he
12        was convicted of a felony?
13    A   No.
14    Q   Are you recommending he be removed because of
15        incompetence?
16    A   No.
17    Q   Do you believe, based on anything you have personal
18        knowledge of, that Officer Young is incapacitated?
19    A   I have no personal knowledge of any type of
20        incapacitation he may have.
21    Q   Are you aware of anything that you would consider
22        just cause that would justify the removal of
23        Officer Young from the Green Oak Township Police
24        Department or police force?
25    A   No.
```

1          MR. OSETEK:    I have nothing further of

2     this witness.

3          Thank you very much.

4          MR. MUSKOVITZ:    I have a few redirect

5     questions.

6          MR. ST. CHARLES:    You wish to redirect?

7          MR. MUSKOVITZ:    Yes.

8               FURTHER EXAMINATION

9     BY MR. MUSKOVITZ:

10    Q    Chief Brookins, you were asked some questions that

11         while Mr. Young was on leave he may have testified

12         at a hearing and there may have been some other

13         contacts with the department.

14              As earlier in your testimony you said his

15         status was inactive while he was on Workers' Comp.

16    A    For a better term, I couldn't come up with one,

17         inactive would be accurate.

18    Q    He remained technically as an employee of the

19         department?

20    A    Yes.

21    Q    Under the Exhibit No. 4, which is the MCOLES

22         statute, I would direct the, I think I can do this

23         partly by just directing the Board to certain

24         pages.  And then this is a preface to a question

25         for the chief.

```
 1                     On page 15 of the statue section --
 2                MR. OSETEK:   I object to any discussion.
 3                     This is redirect testimony, which is an
 4           opportunity to address issues that I brought up
 5           that were not brought up on direct testimony.  I
 6           did not talk about MCOLES statutes at all.  So I
 7           believe it is inappropriate at this time for
 8           additional questioning by Mr. Muskovitz about the
 9           MCOLES statute.
10                     So I would ask that redirect not be
11           permitted.
12                MR. MUSKOVITZ:   If I can respond.
13                     I believe this goes to the issue of
14           definition of employment from the standpoint of
15           department employment and employment for MCOL and
16           the issue of whether or not he remains a certified
17           police officer.
18                     So I believe it is relevant to that issue
19           addressed on cross-examination.
20                MR. ST. CHARLES:   We will let you
21           overrule.  We will proceed, allow you to proceed.
22      Q    (Continuing by MR. MUSKOVITZ):   Section --
23      A    Excuse me, Mr. Muskovitz, can you tell me which
24           exhibit you are referring to?
25      Q    If you look to at Exhibit No. 4, page 15.
```

1   A   Yes.

2   Q   Is it your understanding that if a police officer

3       is not functioning in an active capacity for a

4       period of time, that their certification can be

5       voided or is void?

6               MR. OSETEK:   Objection, foundation.

7   Q   Let me --

8               Go ahead.

9               MR. OSETEK:   We are talking about an

10      agency who has its own policies and procedures, and

11      presumably performs under those.

12              And what Chief Brookins is being asked is

13      what that agency would do.

14              He does not have personal knowledge of

15      that.  If they wanted to bring someone from the

16      agency in to talk about that, this was their

17      opportunity.  But to have Chief Brookins speculate

18      as to what MCOL's or some other agency would do is

19      just that, speculation.

20              And I would ask it not be permitted.

21              MR. MUSKOVITZ:   Well, what I am having

22      him address, and it is not speculation, I can do it

23      through argument.  I am relying on statute and

24      regulations.

25              Let me introduce one other rule as an

1    exhibit from MCOLES.  That would be Rule 28.4101,

2    Sub-Rule 1G, which defines employment under the

3    MCOLES rules and regulations which ties back into

4    the statue.

5                So I would propose introducing that as

6    Exhibit No. 15, I believe we are up to.

7                MR. ST. CHARLES:   Are you talking about

8    what was -- we haven't seen that yet?

9                MR. MUSKOVITZ:   No, you haven't.

10                MR. OSETEK:   I have not seen that, and I

11    would indicate that I think it is not relevant to

12    this Veteran's Preference Act hearing.

13                MR. ST. CHARLES:   I am going to ask for

14    a procedural question.

15                MR. CONNELLY:   Mr. Muskovitz, you are

16    moving to introduce whatever that is as Exhibit

17    No. 15?

18                MR. MUSKOVITZ:   Yes.

19                MR. CONNELLY:   An objection is, it is

20    not relevant to this hearing?

21                MR. OSETEK:   Yes.

22                MR. CONNELLY:   Are you familiar with the

23    exhibit?

24                MR. OSETEK:   I have never seen it.

25                MR. CONNELLY:   Well, it is difficult to

1    speak to relevancy without having seen it, I would

2    think.

3            MR. MUSKOVITZ:   I think one issue that

4    will be briefed by us, the chief's testimony not

5    withstanding, because it is the decision the Board

6    has to make.

7            As I indicated, I prefaced my opening

8    remarks about whether there is a question as to

9    technically even the Veterans Preference Act

10   applies to a situation when somebody is being

11   terminated for reasons not specified in the act.

12   And I think there is some authority to deal with

13   that issue.

14           But I do believe to the extent someone

15   cannot perform all the functions of a position for

16   which they are applying and no obligation to

17   accommodate, that doesn't raise a question as to

18   whether or not they are incapacitated.  And that is

19   an issue addressed in Section 1 of the

20   Veterans Preference Act.

21           And also to the extent that if an

22   individual cannot perform the functions of the job,

23   are they incompetent in the technical sense they

24   cannot perform their job.

25           Historically, the statute dealt with

1    issues of misconduct as evidenced by the questions

2    of Counsel. But I believe it is not limited to

3    that.

4            So I think tieing back to the issue of

5    MCOLES and certification issues and the job duty

6    issues are important to the standpoint of whether

7    or not there is cause to terminate here.

8            MR. ST. CHARLES: Sir?

9            MR. OSETEK: I would let him inquire

10    into this statute or whatever it is.

11            I withdraw my objection.

12            MR. MUSKOVITZ: As I said, I can do it

13    by testimony. It is a rule.

14            MR. OSETEK: You already argued it.

15            MR. MUSKOVITZ: Let me just introduce it

16    as an Exhibit No. 15.

17            MR. ST. CHARLES: You want to introduce

18    it as Exhibit No. 15.

19            That is a motion.

20            MR. OSETEK: Objection to relevance.

21            MR. ST. CHARLES: We will receive this

22    as Exhibit 15, and we will note the objection.

23  Q   (Continuing by MR. MUSKOVITZ): You were asked

24    some questions about certain officers who may have,

25    for example, Officer Danforth who during a

Page 99

```
 1          pregnancy had some light-duty assignment, who did
 2          not perform all the duties of a police officer; is
 3          that correct?
 4     A    That is correct.
 5     Q    All the examples you were asked about, were those
 6          temporary situations?
 7     A    Yes.
 8     Q    Have you ever had an officer who has indicated they
 9          did not want to perform on a regular basis, on a
10          permanent basis aggressive police tactics?
11     A    No.  Mr. Young is my first.
12     Q    And have you ever had any officer request they
13          basically be reassigned from a police officer
14          position to a different position in the department
15          other than Officer Young?
16     A    No.
17     Q    I just want to confirm that currently the police
18          officers are doing their own follow-up on
19          investigations?
20     A    Yes.
21     Q    And you do not have a slot available for a
22          full-time, follow-up officer or investigator?
23     A    That is correct.
24              MR. MUSKOVITZ:   I have no other
25          questions.
```

1          THE WITNESS: If I can consult Counsel

2    for a moment, please.

3          MR. OSETEK: I object to that.

4          MR. ST. CHARLES: You object to that?

5          MR. OSETEK: Yes.

6          Mr. Muskovitz indicated he has no further

7    questions.

8          THE WITNESS: I would have said it before

9    I realized he said he has no further questions.

10         MR. ST. CHARLES: We will sustain that

11   at this time.

12         Mr. Osetek, do you wish to redirect at

13   this time?

14                   FURTHER EXAMINATION

15   BY MR. OSETEK:

16   Q   Other than the short period of time in the fall of

17       1992, have you ever made an offer of any light-duty

18       work for any period of time, whether on a part-time

19       or full-time basis to Officer Young?

20   A   No.

21   Q   Have you hired any part-time people to do court

22       work or other work that officers have done as part

23       of their job during the entire time period that

24       Officer Young has been off on disability?

25   A   MCOLES --

1          MR. MUSKOVITZ:   Before you answer that,

2     I object.

3                I don't believe it is relevant

4     necessarily what he has done at anytime Mr. Young

5     was off on disability, since Mr. Young only

6     requested to return to work as of May of last year

7     and has indicated his limitations at that time.

8                With that objection.

9                MR. ST. CHARLES:   How does the part-time

10     -- how is that relevant in this?

11                MR. OSETEK:   If there was any work

12     available for Mr. Young to do rather than go out

13     and hire a nonfully-certified police officer, they

14     hire part-time work.  And if they have, in fact,

15     done that, which I believe we all are aware that

16     has happened, if that was the type of work that

17     Mr. Young could do, and he has been cleared to work

18     since May of 1993 and the department has been well

19     aware of that, if there was an opportunity for him

20     to do any work and he was capable of doing it, the

21     work should have been made available to him rather

22     than to go out and hire an outside individual.

23     That is how it is relevant.

24                MR. ST. CHARLES:   I don't see the

25     relevancy of this.

1          At this time, I am going to overrule the

2     objection.

3          MR. OSETEK:   No.  You are going to

4     sustain.

5          MR. ST. CHARLES:   Excuse me.

6          I have been up since five o'clock.

7          MR. OSETEK:   I cannot tell that to a

8     regular judge, but I will say it to you.

9          You want to sustain it.

10         MR. ST. CHARLES:   We realize I am not a

11    judge, too.

12         MR. OSETEK:   All of you are today.

13         It is a good experience, I am sure, for

14    everyone.  You have a better appreciation of what

15    they do.

16         MR. ST. CHARLES:   The objection is

17    sustained.

18         MR. PALMER:   Being a judge for a day, do

19    we get extra pay?

20         MR. SEYMOUR:   For you guys.

21         MR. SEDLAK:   When my grandson rubs his

22    eyes like that, it is time for a nap.

23         MR. OSETEK:   I have no other questions.

24    Thank you.

25         MR. MUSKOVITZ:   I have no further

1    questions.

2                    MR. ST. CHARLES:   You may step down.

3                    Mr. Muskovitz, do you have any other

4    witnesses?

5                    MR. MUSKOVITZ:   In light of the hour, I

6    think we said we were not going to proceed past ten

7    o'clock.

8                    MR. ST. CHARLES:   We were hoping not to.

9                    MR. MUSKOVITZ:   In light of the

10   testimony regarding the stun gun, I reserve the

11   right to possibly call a witness to pursue that

12   issue further,  but I don't have a witness here at

13   this time.

14                   And I am close, anyway to the end of the

15   night.

16                   MR. CONNELLY:   Were you asking for an

17   adjournment?

18                   MR. MUSKOVITZ:   If I was going to rest

19   at this point, I didn't think we were going to

20   continue at this point anyway if the idea was to

21   end around ten o'clock, unless we were going to end

22   shortly thereafter, which seems unlikely given the

23   pace we are going.

24                   And because of the issue with the stun

25   gun, I want to reserve the right to call a witness

1    to explore that issue further.

2              MR. ST. CHARLES:   Okay.   We will allow

3    the ability to recall.

4              MR. OSETEK:   Can I raise an objection?

5              This is the time for Mr. Muskovitz to put

6    his case on.   He has the obligation of going

7    first.   He has the obligation of informing me what

8    witnesses he had.   He did not say anything about a

9    stun gun witness.   I did not bring up the stun gun

10   testimony.   He knew well about it all along.   And I

11   think it is prejudicial to continue the hearing

12   while he is in his case because we are ready,

13   willing and able to complete this case tonight

14   instead of waiting until some indefinite future

15   point in time.

16             MR. MUSKOVITZ:   Before you answer that,

17   can I have a moment with my witness?

18             (Discussion held off the record.)

19             (Brief recess.)

20             MR. ST. CHARLES:   Back on the record.

21             You had an objection?

22             MR. MUSKOVITZ:   I withdraw my request

23   for adjournment to call witnesses.

24             I am ready to proceed with calling

25   Sergeant Crowe on the issue of stun gun, and

1     prepared to do that now if the Board wants to.

2          I cannot -- I certainly misjudged the

3     length of time of the testimony for

4     Chief Brookins.  So I am not going to estimate how

5     long my testimony will be with Sergeant Crowe.  It

6     will not be as long as Chief Brookins, but there is

7     a cross-examination, possible redirect.

8          I leave it to the Board if they want to

9     do it now or at another hearing.

10         I assume you have witnesses you are going

11    to call; is that true or not.

12         MR. OSETEK:  Well, I don't believe a

13    stun gun or the issue of the stun gun has any

14    applicability with regard to Michigan's Veterans

15    Preference Act.

16         I think it was a proposal by

17    Officer Young to address some concerns about his

18    physical potential, physical limitations.

19         I think it is interesting that he was

20    aware that the statute was progressing through the

21    legislature and it has in fact been passed.  I

22    don't think we need any testimony about the stun

23    gun.

24         There was already questioning of Chief

25    Brookins about the stun gun.  He talked about the

1      different kinds, how they worked, what they are

2      good for, not good for.

3              By bringing in another witness to testify

4      about that, a witness not identified to us, the

5      letter to us was that they would proceed first and

6      that Chief Brookins would be their witness, and

7      that we then would provide our defense.  And we

8      prepared our defense based on that representation.

9              So at this point in time bring in a

10     witness, not about something that came up as a

11     result of my doing cross-examination that brought

12     new facts or new issues into this case, in fact, I

13     am trying to narrow it down to what I believe the

14     important issues are.  But they are just trying to

15     bring in what I call cumulative testimony which is

16     going to duplicate what you already heard.

17             So I don't believe there is any necessity

18     for additional testimony on the part of the

19     township or on the part of the police department

20     regarding stun guns.

21             MR. MUSKOVITZ:   Well, I think the

22     testimony is relevant.  It would not necessarily be

23     cumulative.  I believe Sergeant Crowe has probably

24     more knowledge about the issue of stun guns than

25     Chief Brookins, or at least another perspective on

1      it.

2                  From the standpoint of identifying

3      witnesses -- from the letter that was written, it

4      was certainly the department's interpretation that

5      Officer Young wanted to use the stun gun in lieu of

6      his firearm.  That may are may not be the case.  We

7      have not heard from him on that, but it was

8      certainly represented it was not the case.

9                  But the use of the stun gun would be used

10     to -- in lieu of aggressive techniques.  We believe

11     that is a very important issue from the standpoint

12     of the police department.  And I believe it does go

13     to whether or not he is incapacitated to be a

14     police officer.  And his competency to be a police

15     officer are issues decided under the Veterans

16     Preference Act.  I do believe it is relevant

17     testimony.

18                 These are important issues to everybody

19     here, not just Officer Young but the Township and

20     citizens as well to put and officer -- have the

21     Board determine whether or not someone is going to

22     be returned to work and using, now on issue of

23     stun gun deserves some attention.

24                 We are ready to proceed at this time or

25     if you want, we will do it at another time.

1          MR. ST. CHARLES:   At this point, I would
2     agree that in light of the fact that we have been
3     made aware of at least new legislation, it is fair
4     to say nobody was aware of, and how it does affect
5     the department, we need to have further testimony
6     and an additional witness.  So we will allow that.
7          Whether we get there tonight in lieu of
8     the hour or in light of the hour, I don't think
9     that is going to happen.  This would allow
10    Mr. Osetek to prepare for that testimony.
11         What I would recommend is that we adjourn
12    at this time, and we set, and I would suggest the
13    14th, which is two weeks from tonight.  We have a
14    Board meeting a week from tonight.  And I would
15    suggest if this is an agreement to everybody else,
16    we look at six o'clock so we can get started.
17         When I look at it, you have one more
18    witness and Mr. Osetek, you have three witnesses?
19         MR. OSETEK:   We have listed a number of
20    witnesses.  And the witnesses we choose depends on
21    the testimony that comes in.
22         MR. ST. CHARLES:   It is possible we need
23    some time by the way things are going tonight.
24         MR. OSETEK:   As I indicated earlier, we
25    could finish tonight.

1      MR. ST. CHARLES:   And I realize that.

2      MR. OSETEK:   I am absolutely confident

3  of that.

4      MR. ST. CHARLES:   Normally we set our

5  meetings at 7:00, but to try to finish this up in

6  one night, does six o'clock work for you?

7      MR. OSETEK:   It will, if I can check.  I

8  didn't bring my calendar with me.  I thought we

9  would be done tonight.

10     MR. ST. CHARLES:   If it is a conflict,

11 we can schedule it to another off night.

12     MR. OSETEK:   If I can -- I call Mel and

13 if I have a problem, I will let him know, okay.

14     MR. ST. CHARLES:   I guess I ask the

15 Board if there is a problem or conflict in the

16 scheduling, is it something we can work out and set

17 the date?  Is that agreeable to the Board members?

18     MR. SEYMOUR:   Does it have to be a

19 Wednesday night?

20     MR. ST. CHARLES:   We will try to work

21 something out that will work with everybody's

22 schedule.

23     Is that agreeable?

24     MR. OSETEK:   Great.

25     MR. ST. CHARLES:   We will adjourn at